# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

B.H., GUARDIAN OF B.B.,

      Plaintiff,

vs.

WEST CLERMONT BOARD
OF EDUCATION,

      Defendant.

Case No. 1:10-cv-520

Judge Timothy S. Black

## ORDER: (1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 21); DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 20); AND (3) TERMINATING THIS CASE FROM THE COURT'S DOCKET

This civil action is before the Court on the parties' cross motions for summary

judgment (Docs. 20, 21)[1] and the responsive memoranda (Docs. 22, 23, 24, 25).

## I.  PROCEDURAL HISTORY

This is an appeal from a special education administrative proceeding, and the

parties to the appeal have filed cross motions for summary judgment.  Plaintiff seeks a

reversal of the Ohio Department of Education's State Level Review Officer's ("SLRO")

decision and reinstatement of the Impartial Hearing Officer's ("IHO") initial decision.

Additionally, Plaintiff seeks attorney fees and costs.

---

[1] Plaintiff requests oral argument on this motion.  (Doc. 21).  Local Rule 7.1(b)(2) anticipates oral argument only if it is "deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented."  Here, the Court finds, however, that the pleadings are clear on their face and that oral argument is not necessary.  *See also Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006) (J. Dlott) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

Plaintiff initially filed a due process complaint on May 5, 2009. The due process hearing was held over seven days on July 28-30, August 10-12 and 28, 2009. (IHO decision at 2). The IHO's final decision was issued on October 26, 2009. (*Id.* at 15-16). The IHO found that West Clermont procedurally violated the Individuals with Disabilities Education Act ("IDEA")[2] by failing to consider outside evaluations and thereby predetermining the speech services needed for B. (*Id.* at 22). The IHO concluded that these procedural violations resulted in substantive denial of free appropriate public education ("FAPE"). (*Id.* at 22, 41). Additionally, the IHO concluded that B did not receive any educational benefit from her behavioral goals and that her behavior had regressed as a result of the use of physical restraints and inconsistent use of her behavior plan. (*Id.* at 27-28, 34-36, 41). Thus, the IHO concluded that B was denied FAPE. (*Id.*

---

[2] IDEA provides federal funds to assist states with the education of disabled students. 20 U.S.C. § 1411. In exchange for these funds, states must provide a "free appropriate public education to . . . all children with disabilities residing in the State." *Id.* The state school system must develop an annual IEP for each child with a disability outlining the goals and services for the child. *Id.* IDEA also establishes procedural mechanisms by which children with disabilities or their parents may "present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6)(A). The first step is the filing of such a complaint with the school board, after which the parents have a right to an "impartial due process hearing" conducted by the appropriate state or local educational agency. *Id.* A state IHO presides over this hearing and receives evidence. *Id.* at § 1315(f)(1)(A). Any party may appeal the result of the IHO hearing to an SLRO. *Id.* at § 1415(g)(2). Futher, any party seeking relief from the SLRO's decision may bring suit in the appropriate state or federal district court. *Id.* at § 1415(i)(2)(A). Reviewing an IDEA is a two-part analysis. First, the Court "must determine whether the school system has complied with the procedures set forth in the IDEA" and second, the Court "must assess whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefits." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 853-54 (6th Cir. 2004).

at 42). With respect to therapy services, the IHO found that B had been denied FAPE because of West Clermont's failure to provide direct rather than consultive speech and occupational therapy during the 2007-2008 and 2008-2009 school years. (*Id.* at 41). Further, as a result of the denial of FAPE in this area, the IHO ordered that B be placed at Applied Behavioral Services ("ABS")[3] at District expense for the 2009-10 and 2010-11 school years, with transportation, a functional behavior assessment, and two years of remedial speech and occupational therapy services. (IHO Opinion at 41-43). After the hearing, the school district agreed to change B's stay put placement to ABS. (Add'l Evid submitted by District to SLRO, Oct. 25, 2009, IEP).

West Clermont timely appealed the October 26, 2009 IHO decision with respect to the 2010-11 school year, ABS placement, and remedial therapy awards to State Level Review Officer ("SLRO") Teresa L. Hagan, Esq. In a decision dated June 28, 2010, the SLRO reversed the IHO's decision and order in its entirety. The SLRO found that the IHO incorrectly concluded that West Clermont had denied B FAPE in the 2007-2008 and 2008-2009 school years. (SLRO Decision at 2-4). The SLRO found that Plaintiff failed to show by a preponderance of the evidence that any procedural violations caused adverse or substantive effects on B's educational performance. Furthermore, the SLRO determined that there was no serious denial of the Plaintiff's participation rights in the

---

[3] ABS is a comprehensive treatment training and educational placement center for children with autism spectrum disorders and other developmental disabilities. *See* http://www.appliedbehavioralservices.com

-3-

IEP process and that B did not suffer any denial of educational benefits as a result. (*Id.* at

3). The SLRO also determined that B was not prevented from benefitting from her IEP

due to the use of physical restraints or from the failure of West Clermont to provide a

more effective behavior management plan. (SLRO Decision at 3-4). Finally, the SLRO

also determined that because B had not been denied FAPE, the IHO erred in awarding

any compensatory education. (*Id.* at 4).

As a result of the SLRO's decision, Plaintiff brought the instant action seeking a

review and appeal of the SLRO decision.

## II.    BACKGROUND FACTS[4]

At the time of the hearing in this matter, B was a 10 year-old child residing in the

West Clermont Local School District. When B was four months old, Plaintiff B.H.

("Mrs. H"), took her in and subsequently became her legal guardian. (Tr. at 738). B has

a variety of diagnoses including mental retardation, poorly controlled epilepsy, asthma,

selective mutism,[5] ADHD, explosive behavior disorder, Cushing's Disease,[6] pervasive

---

[4] Having completed a thorough review, the Court paints here in broad stroke only the most
relevant aspects of B's background, as the full administrative record consists of an entire bankers
box of documents, including thousands of pages of transcripts, exhibits, and relevent documents.

[5] Selective mutism is a communication disorder in which a person, most often a child, who is
normally capable of speech, is unable to speak in given situations, or to specific people.

[6] Cushing's disease is caused by a tumor or excess growth of the pituitary gland. This gland
is located at the base of the brain. People with Cushing's disease have too much ACTH. ACTH
stimulates the production and release of cortisol, a stress hormone. Too much ACTH means too
much cortisol. Cortisol is normally released during stressful situations; it controls the body's use
of carbohydrates, fats, and proteins and also helps reduce the immune system's response to
swelling. Patients frequently suffer various psychological disturbances, ranging from euphoria to
psychosis. Depression and anxiety are also common.

developmental disorder (a form of autism), and post traumatic stress disorder. (Pet. Ex. GGG, Tr. 28-31; IHO Opinion at 2). B was qualified by West Clermont as a student with multiple disabilities in a 2006 Evaluation Team Report ("ETR"). (Pet. Ex. D). Among other things, the 2006 ETR identified B as having significant adaptive behavior deficits and a language disorder which qualified her for speech therapy. (IHO Opinion at 3; Pet. Ex. D at 46, and last page of Pet. Ex. D).[7]

B had significant behavior issues which included aggression, noncompliance, and leaving the classroom and building without permission. (IHO Opinion at 4; Pet. Exs. U, W, VV, JJ, EEE). Plaintiff had B evaluated at Cincinnati Children's Hospital for both speech and occupational therapy issues in 2006-2007, and those evaluations were provided to West Clermont (Pet. Exs. OO, QQ), including to Nancy Parks, the principal of Holly Hill Elementary, where B was a student. (Tr. 745-7, 1026; IHO Opinion at 3, 5). The speech evaluation recommended that B receive direct speech therapy, and the occupational therapy evaluation recommended that she receive direct occupational therapy. (Pet. Exs. OO, QQ). The communication evaluations found that B has expressive-receptive language deficits. (IHO Opinion at 5; Pet. Ex. OO). The occupational therapy evaluation identified B as having significant deficits in the areas of hygiene, toileting, self-care, reciprocal communication, and attention to task, among other things. (IHO Opinion at 6; Pet. Ex. QQ).

---

[7] The pages of Pet. Ex. D are not consecutively numbered.

B was also treated by a behavior specialist, Dr. Jessica McClure, who wrote letters in the fall of 2007, which were provided to Principal Parks, stating that B required speech services, and a positive reward program to help address her behavior. (IHO Opinion at 6, 7; Pet. Ex. RR, SS and Tr. 1026). B also had several neuropsychological evaluations from Cincinnati Children's Hospital in 2005, 2007, and 2008, recommending direct speech and occupational therapy for a severe expressive-receptive language deficit, and a positive behavior reinforcement system to help her control her behavior. (IHO Opinion at 3, 5; Pet. Ex. F, NN and PP). All of the neuropsychological evaluations state that B's I.Q. is in the high 50's or low 60's[8] and that she presents with a cognitive deficit in the moderately impaired range. (Pet. Ex. F at 2, NN at 1 and P at 2).

B attended Holly Hill Elementary School from August 2007 through January 2009. (IHO Decision at 2-3). She attended the third and fourth grade in the 2007-2008 and 2008-2009 school years. (*Id.*) Her Individualized Education Program ("IEP") period ran from November to November so that in August of 2007, B was still following the 2006-07 IEP.[9] (Pet. Ex. L). None of B's IEPs (2006, 2007, 2008), contained any goals

---

[8] Approximately 5% of the population has an I.Q. under 70, which is generally considered the benchmark for mental retardation.

[9] Defendant claims that when B's IEP team met in November 2006, they addressed her selective mutism and agreed that in light of this disorder she should receive speech therapy services from November 2006-November 2007 by the speech language pathologist consulting with Plaintiff's teacher on a quarterly basis and that the speech language pathologist would provide material as needed or requested by the special education staff. (Resp.'s Ex 2 at 56-57). Defendant claims that Mrs. B was a member of the IEP team and agreed to these speech therapy services which did not include direct speech therapy. Defendant claims that in November 2007, before the IEP meeting, Mrs. B requested that B receive direct speech therapy. Mrs. B agreed to continue consultative only speech therapy services for B in the IEP's developed in November 2007 and November 2008. Defendant maintains that Mrs. B agreed to excuse the speech therapist from attending the IEP meeting in November 2007 and November 2008 and agreed that B should receive consultative only speech therapy services. (Resp.'s Ex. 2 at 76, Resp.'s Ex. J at 15; Tr. at 646).

designed to address the significant adaptive behavior deficits she possessed including

ongoing toileting issues (Tr. 753), hygiene issues (Tr. 753), self care skills (Tr. 747), and

reciprocal social and communication needs. (Tr. 758; Pet. Ex. B, J, K, L, and AAAA; Tr.

145-46).

In the fall of 2007, Plaintiff sent letters to both Mrs. Parks, the principal of Holly

Hill, and Mr. Nacke, B's special education teacher, detailing concerns she had about B's

behavior, adaptive behavior deficits, and need for direct speech and occupational therapy.

(Pet. Ex. TT, UU; IHO Opinion at 7). While both Parks and Nacke acknowledged

receiving these documents, no changes to B's IEP were made at that or any other time.

(Tr. 376-378, 1003-04; 1032-34). At no time did anyone in the District send a prior

written notice to Plaintiff explaining the District's refusal to provide speech or

occupational therapy, or its refusal to address B's functional needs in her IEP, or advising

her of her rights. (Tr. 749, 1097, 1032-34). B's IEP for the 2007-08 school year provided

her with 30 minutes of speech consult per quarter, which was reduced in the 2008-09

school year to 15 minutes of speech consult per quarter, for a total of 45 minutes per year.

(Pet. Ex. J, K; Tr. at 638). The speech therapist, Meg Stansbury, never worked

with B, was not aware that she had a cognitive deficit, was not aware that she had a

language disorder, or that the 2006 ETR recommended that she receive speech therapy.

(Tr. 629, 631). B was receiving 30 minutes of OT consult per month on both the 2007-08

IEP and 2008-09 IEPs for handwriting and sensory issues only. (Pet. Ex. J, K).

B's behaviors, while challenging, were still manageable at the beginning of the 2007-08 school year, and she was spending most of her time in the regular education classroom. (IHO Opinion at 8; Tr. 43-45, Pet. Ex. K). By December of 2007, B's practice of running out of the classroom had become enough of an issue to warrant the District completing a functional behavior assessment. (IHO Opinion at 8; Pet. Ex. VV). The assessment, completed by an untrained aide, revealed that B was being restrained in her chair by the aide.[10] (Tr. 426, 436, 1025-26; IHO Opinion at 8). No changes were made to the IEP as a result of this assessment. (IHO Decision at 30).

Over the course of the spring of 2008, B's behavior became more difficult, resulting in episodes documented by the aide in daily notes. (Pet. Ex. EEE). B had frequent "fits" and her behavior escalated and included hitting, kicking, spitting, and noncompliance. (Pet. Ex. EEE; IHO Opinion at 9). The behavior plan used in the classroom was a "point" system which allowed B to earn points to move up "levels." (Pet. Ex. EEE). By April 2008, Mrs. H was notified of the aide's concern regarding the escalation in B's behavior (Pet. Ex. EEE 15), but neither the principal nor the teacher took any steps to address the increasing escalation. (Tr. 430). Mr. Nacke had commenced using "CPI"[11] holds to force B to stand up when she refused, and acknowledged that B's

---

[10] Defendant claims that the functional behavior assessment revealed that on one occasion an aide kept B from leaving the classroom by keeping her in her seat. (IHO Decision at 29-30). Defendant maintains that there is no evidence in the record as to how the aide kept B in the seat.

[11] CPI refers to Crisis Prevention Intervention, which includes a variety of methods of restraint and other crisis prevention techniques. *See, e.g.*, Pet. Ex. KKK.

aggressive behaviors worsened in the spring of 2008. (Tr. 384-6, 464; IHO Opinion at 9).[12]

When B returned to school in the fall of 2008, her behavior problems reappeared on the first day. (Tr. 484-5). As in the prior year, B was again required to follow a "point system" used in the special education classroom for emotionally disturbed students. (IHO Opinion at 8; Tr. 466-71, Pet. Ex. JJ). Plaintiff expressed concern to the teacher, Mr. Nacke, that B did not understand the point system. (IHO Opinion at 7; Tr. 514, 886, 783-4). Rachel Perlstein, who came in to assist the school district from the Clermont County Board of Mental Retardation ("MRDD"), also advised the District of her concerns regarding B's ability to understand the behavior system in place.[13] (Tr. 920-21).

The point system in the classroom required B to acquire a certain minimum number of points every day, with each point total differing for different activities, and to

---

[12] Defendant claims that B's increasingly aggressive behavior started in the summer of 2008 while she was on summer vacation. (Tr. at 990). Mrs. H and her family had been receiving services at home for almost four years from several Clermont County agencies such as Child Focus, Clermont County Board of Developmental Disabilities, and Pressley Ridge, to address Plaintiff's behaviors at home. (Tr. at 829-832).

[13] Defendant claims that the testimony of the West Clermont staff members who worked with B indicated that she understood the level point system and was glad when she earned her points and upset when she did not. (Tr. at 418, 471, 1042, 1091). However, Mr. Nacke's testimony regarding B's understanding simply states that she knew that getting a "0" was bad. (Doc. 20 at 6). Dr. Jensen also testified that B understood that recieving a "0" was bad. (Tr. 68-69). However, Dr. Jensen further stated that given B's cognitive level and behavior deficits, B could not understand how the level system worked, or how she was supposed to use it to enable herself to manage her own behavior. (Tr. 68-69, 78-79). The IHO found this to be credible and determined that where Mr. Nacke had to explain to B how the level system worked 4-5 times per week, it should have become apparent to him that B did not understand it. (IHO Opinion at 34).

achieve those numbers for eight consecutive days in order to move to the next level where additional privileges were afforded. (Tr. 466-71, Pet. Ex. JJ; IHO Opinion at 8). B could earn up to 2 points for each of five different behaviors ("following directions," "stay in own space," "on task," "positive peer interaction," and "positive staff interaction") for each of the seven periods of the day. (Tr. 466-71). Those points were subtotaled. B could earn up to seven points for her 3 personal goals (communicate needs, uses sensory items correctly, and completes task in timely manner). (Tr. 366-72). She could obtain up to 5 points for bus behavior, and up to 4 points for recess. (Tr. 466-72). These were totaled at the end of each day out of a total possible number of 100 points per day. (Tr. 466-72). If she "made her day," depending on what her IEP required, she then had to reach that number for 8 consecutive days in order for her to reach the next "level." (Tr. 466-72).[14]

B never made it out of Level One, the lowest level, after the second day of school in August 2008, until the time she left Holly Hill in January of 2009. (Tr. 492). In fact, the teacher often docked B points while sleeping, even though she had a poorly controlled seizure disorder, and took medication that causes sleepiness. (Tr. 83, 171, 176, 610, 780-1, 1125-27). Frequently B had severe behavioral outbursts, where she was physically restrained, but still was rewarded with points, while at other times, she had fewer

---

[14] Plaintiff points out that the District characterizes the point system as enabling B "to earn points based on her behavior on a scale of 0 to 2." (Doc. 20 at 6). However, the points system, as explained by Mr. Nacke, involved differing points for differing behaviors, times of day, and activities. (Doc. 21 at 7-8). Therefore, the point and level system which B was supposed to utilize to control her behavior was far more complex than just a 0-2 scale.

-10-

behaviors, but failed to achieve the necessary number of points.[15] (IHO Opinion at 8-9;

Pet. Ex. U and JJ; Tr. 51, 52, 67- 69, 72-80, 86). In September 2008, a

neuropsychological evaluation was completed on B recommending direct speech,

occupational therapies, and the use of a formal behavior system with immediate rewards.

(Pet. Ex. F; IHO Opinion at 10).

From the first day of the 2008-09 school year, B was repeatedly physically

restrained by staff at Holly Hill for her behaviors, sometimes multiple times per day.[16]

(Tr. 484-90, 495-6, 505-6, 511, 524; Pet. Ex. U; IHO Opinion at 9-10). Mrs. H was not

always notified when physical restraint was used, or why, even though she specifically

requested that she be advised. (Tr. 900-1). The use of physical restraint was not

indicated anywhere in B's IEP, and no prior written notice was provided to Mrs. H when

---

[15] Defendant alleges that there is no evidence that there was a lack of consistency in the application of this level point system and that there is no evidence of any concern by anyone regarding the inconsistent application or implementation of the point system.

[16] Defendant claims that between August 28, 2008 and October 3, 2008, staff members had to use physical safe holds on B on nine days during that time span and sometimes more than once on those days, to restrain B and stop her from hitting, kicking, scratching, and spitting at her teachers and aides. (Pet.'s Exs U, KK). Defendant claims that after the first week of October the need to use safe holds on B decreased dramatically and from October 4 through the Christmas break a physical safe hold had to be use on B only once. (Pet.'s Ex. U). Defendant alleges that B was hospitalized in mid-December 2008 and was not at school the week and a half before the start of the Christmas break. (Resp.'s Ex. 38). When B returned to school in January 2009, her behaviors again increased causing West Clermont's staff to have to use safe holds on her several times in January. (Pet.'s Ex. U at 19-26). The final time a safe hold was used on B was on January 21, 2009. Defendant alleges that B arrived late to school that day because her behavior at home prevented her mother from getting her to school on time. (Tr. at 842-943; Res.'s Ex. 28 at 240-45). B was hospitalized again on January 21 or shortly thereafter, and did not return to Holly Hill Elementary School for the rest of the 2008-2009 school year.

it was used on a regular basis. The present levels in the 2008-09 IEP state that B was restrained 21 out of 26 days from August 2008 through October 9, 2008. (Pet. Ex. J; IHO Opinion at 9-10). Plaintiff attempted to assist the District in managing B's behaviors by communicating with them every day, advising them about everything going on at home, and bringing to the school district personnel from other agencies to assist. (Tr. 898-903). In October 2008, Mrs. H wrote a letter to Mrs. Parks expressing concern about B's behavioral regression and requesting a meeting to discuss a behavior plan. (Pet. Ex. YY). While a behavior plan was developed (Resp. Ex. 9, 10, 11, 12), the recommendations made by the evaluations for positive immediate rewards and reinforcement were not used in the school, and the suggestions were inconsistently applied, according to Ms. Perlstein. (IHO Opinion at 11, 32; Tr. 929- 30).

On January 21, 2009, B was restrained 8 times in one day by Mr. Nacke.[17] (Pet. Ex. U25- 6). She came home bruised and hysterical and had to be hospitalized. (IHO

---

[17] Defendant claims that the IHO incorrectly found that B had physical safe holds used on her by Mr. Nacke. (IHO Decision at 9, 30). Defendant claims that this is incorrect because the evidence in the record establishes that no restraints or physical safe holds were used on B during the 2007-2008 school year. (Tr. at 461, 1087). In fact, B's classroom teacher, Meg Patton testified that during the 2007-1008 school year, B's disruptive behaviors decreased, which resulted in the steady increase of regular education classroom time during that year. (*Id*. at 1087, 1096-97). In fact, Ms. Patton testified that B's disruptive behaviors only increased toward the end of the school year because B knew that school was ending and she liked school. (*Id*.) Ms. Patton was B's regular education teacher during the 2007-2008 school year and there is nothing in her testimony regarding B's behaviors in Mr. Nacke's class, where the escalation occurred, as reflected in Petitioner's Ex. EEE. Mr. Nacke acknowledged that B's behaviors worsened during that year. (Doc. 21 at 33). Moreover, the behavior goals in B's IEPs were downgraded every year from 2007-2008, reflecting B's worsening behaviors when each succeeding IEP required that B obtain fewer and fewer points to reach her goal. (Pet. Exs. J, K, L; Doc. 21 at 32).

Opinion at 12; Tr. 796, 843, 903, 964). Plaintiff claims that Mr. Nacke[18] failed to complete a "safe hold" form or notify the principal of these restraints.[19] (Tr. 965). Plaintiff thereafter refused to return B to West Clermont, as they could not promise they would not continue to restrain her. (Tr. 1176, 890-91; IHO Opinion at 12). B was out of school until April when she was placed at The Wildey School, a program of the Clermont County Board of MRDD.[20] The District did not, and still does not, think Wildey was an appropriate program. (Tr. 978). Plaintiff wanted B sent there because Wildey does not use physical restraint. (Tr. 804-5; IHO Opinion at 12). While at Wildey, B exhibited the same behavior pattern she had while at West Clermont. (Tr. 1073). However, The Wildey School was able to manage her without using any restraint. (Tr. 1087; IHO Opinion at 12).

The due process request was filed by Plaintiff in May 2009. Among other things, the request sought behavior, speech, and occupational therapy evaluations by individuals

---

[18] Notably, Mrs. Parks' teacher evaluation of Mr. Nacke in February of 2009 indicates that most of his teaching skills were rated unsatisfactory or needed improvement. (Ex. MMM at 43-51).

[19] Former Governor Ted Strickland issued an executive order on the use of physical restraint by seven departments with the state, including the Ohio Department of Education. Executive Order 2009-13S (August 3, 2009). In it, the Governor recognized that "The use of restraint and seculsion can have a lasting impact on both individuals receiving care and the caregivers themselves . . . because physical restraint, in general, is not viewed as a therapeutic or beneficial intervention, other types of physical restraint are to be used only when there is risk of escape or harm to the individual or others . . . by trained staff and under the approval, guidance and restrictions as outlined within each department's policies."

[20] Children at the Wildey School are referred by MRDD by their local school districts because they have special needs that cannot be met with a typical classroom setting.

trained in behavior management techniques. (Pet. Ex. TTT). The District contracted with

Applied Behavioral Services ("ABS"), a private day treatment center, to conduct the

evaluations, one month after the due process request was made. (Tr. 588; VVV). The

evaluations revealed that B requires direct speech and occupational therapy services to

address her significant areas of deficit in communication, adaptive and self care skills,

among other things.[21] (Tr. 598-99; Pet. Ex. AAAA). The behavior evaluation determined

that B could benefit from the use of Applied Behavior Analysis, a research based

treatment method used by the staff at ABS. (Pet. Ex. AAAA; IHO Opinion at 12-14).

Finally, B was evaluated by Dr. Vanessa Jensen, a highly credentialed, licensed

clinical psychologist in the behavioral pediatric psychology department at the Cleveland

Clinic. (Pet. Ex. A). Dr. Jensen has 25 years experience working with and evaluating

children with autism and other developmental disorders. (Tr. 19-25; IHO Opinion at 13-

14). She has been involved in the creation of programs for children with autism, ADHD,

cancer, and GI disorders. She has extensive experience in the development of school

programs, behavior plans, and vocational programs for developmentally disabled

children, and has substantial experience working with IEP teams. She has also served on

the faculty of several universities, and has a vast array of peer reviewed publications. Her

---

[21] Defendant claims that B is selectively mute at school, and that while she is capable of understandable speech, in the school evironment she rarely communicates by speech. (Tr. at 216). During the 2006-2007 school year, B received direct speech therapy for 120 minutes per month at the start of the school year, and an informal assessment of Plaintiff in 2006 descibed her speech therapy requirement as no need for intervention support from the speech pathologist from February 2006 through June of 2006. (Resp.'s Ex 1 at 41). Therefore, the IEP team determined that B no longer needed direct speech therapy.

clinical practice includes diagnostic evaluation of children with complex developmental, genetic, and autism spectrum disorders. Her services are utilized by both school districts and parents in the determination of appropriate programming and behavior management. (Tr. 19-25; Pet. Ex. A).

Dr. Jensen's report reached the same conclusions as the evaluators retained by the District. Dr. Jensen determined that B suffers from significant adaptive behavior deficits, and the goals in her IEP were not appropriate for her. (Tr. 189). Her skill levels have failed to progress since prior to the time she came to Holly Hill. (Pet. Ex. B). Dr. Jensen further stated that the behavior management program used in Mr. Nacke's class was too complicated for B to understand, that it was inconsistently applied, and had the effect of reinforcing her unwanted behaviors. (IHO Opinion at 14; Tr. 48-59, 77-8, 85-6; Pet. Ex. B). Dr. Jensen found that the use of physical restraint on B over such an extended period was inappropriate, and, in any event, was not working to reduce her behaviors. (Tr. 89-90; Pet. Ex. B). Dr. Jensen opined that B would benefit from discrete trial teaching, and a program that uses Applied Behavior Analysis, which is a research based treatment method for behavior management that uses positive reinforcement. (IHO Opinion at 14; Pet. Ex. B). According to Dr. Jensen, without interrupting the slide evidenced over the past two years, B would be expected to continue a downward spiral which could make it difficult for her to stay at home. (Tr. 200-01). Dr. Jensen stated that 3-4 years of remediation could compensate B for the loss suffered as the result of the inappropriate programming from the District. (Tr. 183-4, Pet. Ex. B).

## III.   STANDARD OF REVIEW

While the pending motions are styled as ones for summary judgment, the standard of review differs from a typical Rule 56 motion.  This Court is required to apply a "modified de novo" review to appeals from administrative proceedings under the IDEA. *N.L. v. Knox Cnty. Schools*, 315 F.3d 688, 692 (6th Cir. 2003).  This standard dictates that the Court "make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings, particularly when educational expertise is essential to the findings." *Id*.  Because this case involves both procedural and substantive issues, the Court must distinguish the standard to be applied to each.

As for substantive issues, the preponderance of the evidence language in IDEA indicates "the deference due to the administrative findings is less than that generally accorded to administrative decisions, whereby the court will uphold a decision if it is supported by substantial evidence." *Burilovich Pet. Ex. rel. Burilovich v. Bd. of Educ. of the Lincoln Consol. Schools*, 208 F.3d 560, 566-67 (6th Cir. 2000).

> [W]e hold that administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both.  A court should defer to the administrative findings only when educational expertise is relevant to those findings and the decision is reasonable . . .We also reiterate that, when there is a conflict between the holdings of the local and state hearing officers, the court must defer to the state hearing officer's decision in reviewing the record on appeal.

*Id*.

However, when educational expertise is not relevant to the findings, less weight is afforded to the administrative decision "because a federal court is just as well suited to evaluate the situation." *Kings Local School Dist. Bd. of Educ. v. Zelazny*, 325 F.3d 724, 728 (6th Cir. 2003). According to this "modified" *de novo* standard of review, a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings. *Knable v. Bexley City School Dist.*, 238 F.3d 755, 764 (6th Cir. 2001). While this Court must afford the SLRO deference where educational expertise is applied, it will not "second guess" the credibility determinations made by an IHO who "was in the best position at the due process hearing to assess the credibility of the witnesses who testified." *Bd. of Educ. of the City School Dist. of the City of Cincinnati v. Wilhelmy*, 689 F.Supp.2d 970 (S.D. Ohio 2009).[22]

## IV.   ANALYSIS

Plaintiff makes essentially four arguments in favor of overturning the SLRO's decision: (1) Plaintiff was denied meaningful participation in the IEP process because West Clermont pre-determined services and failed to provide Plaintiff with the necessary prior written notice; (2) Plaintiff was denied a FAPE because of West Clermont's

---

[22] The Court notes that it need only consider the evidence to which it is directed in the motions, regardless of whether other potentially relevant evidence exists somewhere in the record. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007). The Court has no independent "duty to sift through the record in search of evidence to support a party's opposition to summary judgment [or the motion itself]." *Id.*

improper behavior program; (3) the SLRO's decision was improper in overturning the IHO's award of compensatory education and remedial occupational speech therapy; and (4) the SLRO's decision was incorrect in denying Plaintiff prevailing party status and thus an entitlement to receive attorney fees.

### A.    Procedural Violations

#### *1.    Speech Services*

Plaintiff claims that the District violated the law when they failed to give Mrs. H's outside evaluations any consideration.  The Federal Regulations provide that independent evaluations obtained privately by parents must be considered by the school district in any decision made with respect to the provision of FAPE to the child.  34 C.F.R. § 300.502(c); O.A.C. § 3301-51-05(G)(3).  Plaintiff claims that these procedural violations amounted to the District's predetermination[23] of B's speech and occupational therapy services for both the 2007-08 and 2008-09 school years.  "Districts are not permitted to predetermine services for a child with a disability.  Related services on a child's IEP are part of the IEP process."  34 C.F.R. § 300.320(a)(4).[24]

---

[23]    "Predetermination" is "pre-select[ion of] a particular program for [a student before creating his or her IEP,] regardless of [his or her] demonstrated individual needs."  *Nack v. Orange City School Dist.*, 454 F.3d 604, 610 (6th Cir, 2006).

[24]    According to Ohio's Operating Standards, services in a child's IEP must be decided after goals and objectives have been determined.  O.A.C. § 3301-51-07(H)(1).  The necessary services are those which enable the child "to advance appropriately toward attaining the annual goals." *Id.* at (H)(1)(e).

In 2007 and 2008, Mrs. H provided Nancy Parks with the speech, neuro-psychological, and OT evaluations from Cincinnati Children's Hospital. (Tr. 745-47, 1026). These evaluations established that B needed direct speech-language services and occupational therapy to work on adaptive behavior and self care skills in her educational program, or she would regress. (Pet. Ex. F, NN, PP, QQ, RR, SS). Additionally, Dr. McClure, of Children's Hospital, also sent a letter to Mrs. Parks requesting speech and behavior services for B. (Tr. 1026, and Pet. Ex. RR, SS).

The IHO found that the team did not consider those evaluations or letters as required by law and in violation of IDEA. (IHO Opinion at 17). Mrs. Parks acknowledged and admitted that the letters and evaluations she received were not considered at the IEP meetings for B. (Tr. 1026-28, 1031-1032, 1034). However, the SLRO found that just because the IEP team did not include the recommendations for B's speech and occupational therapy, did not mean that the team did not consider the evaluations. (SLRO Opinion at 15). This finding is not supported by Mrs. Parks' express admission to the contrary.

Despite the SLRO's extensive discussion of the issue, Plaintiff does not argue that excusing the speech therapist from the IEP meeting amounted to pre-determination of speech therapy. The dismissal of the speech therapist, by itself, is not the issue. Plaintiff focuses on the notations on the excusal form by which the District predetermined that B would receive minimal consultative speech services. (IHO Opinion at 18-19). The forms

excluding Ms. Standburg, the District's speech pathologist, state that B would continue to receive the 15 minute consult per quarter that she had been getting. (Pet Exs. J15, K14). These documents were created in both the 2007 and 2008 school years, *prior* to the IEP meetings. (Pet Exs. J15, K14). Accordingly, the evidence clearly shows that speech services had been predetermined before the IEP team ever met.

While districts and parents can agree to excuse team members from attendance where services remain unchanged (34 C.F.R. § 300.321(e)(2)), the agreement in this instance was made without the information that would have informed Ms. Standbury of the new evaluations. Ms. Standbury testified that she had never been sent the neuropsychological evaluations done on B in both 2005 and 2008, which recommended that B receive speech therapy, and did not even know that Mrs. H had requested direct speech therapy. (IHO at 17; Pet. Exs. F and MN, Tr. 632-34, 638). The IHO determined that since Ms. Standbury did not know anything about B, and was not provided with the evaluations, she could not have contributed to the discussion even if she had been present at the meeting. (IHO Opinion at 18-19, 22).

Therefore, the evidence supports a finding that the District ignored the documentation of B's need for speech services which supports the IHO's conclusion that the District predetermined that B did not need speech services in violation of 34 C.F.R. § 300.320(a)(4). The Court declines to give deference to the SLRO's finding, where it is clear that such a finding was not based on the record evidence. (Tr. 1026-28, 1031-1032, 1034).

### 2.    OT Services

The OT and neuropsychological evaluations done by Cincinnati Children's Hospital related to B's need to learn appropriate hygiene, toileting, and self care skills, which also required direct service. (Pet. Exs. F, NN, PP, QQ). Plaintiff claims that none of those evaluations were ever considered by the District, despite Mrs. H's repeated requests. (Tr. 745-48, 751, 757, 758, 821-22). In October 2007, a meeting was held where the concern was documented by "Mom and the other professionals in this case that no OT services have yet to begin within the school program . . . There has been some concern expressed by both psychiatry and psychology services at [Children's Hospital] that previously made gains may begin to slip without a unified effort on the part of all providers." (Pet Ex. WW; Tr 404).

The SLRO opinion found that "Kid Power" evaluations were considered in B's IEPs for the 2007-08 and 2008-09 school years. (SLRO at 16-17). Specifically, the SLRO found that the "Kid Power" evaluations state that B's occupational therapy needs were "reviewed and discussed by the IEP team." However, the Court notes that the only Kid Power evaluation to recommend consultive OT was done in conjunction with the October 2006 ETR, a year before the 2007 IEP and two years before the 2008 IEP. (Pet Ex. D; Sept. SLRO Brief at 24-26).[25] The Kid Power evaluation done in September 2007

---

[25] With respect to the occupational therapy services, the SLRO found that such services were not predetermined in violation of IDEA. Defendant claims that the occupational services in the IEP changed from direct to consultative upon the recommendation of the occupational therapist because B had difficulty working with an outside person and a recommendation was made that consulting with the teachers was more effective. (Resp.'s Ex. 1 at 44).

stated that "[i]ndividual occupational therapy by a therapist with training in the above-mentioned areas is recommended at this time." (Pet Ex. XX, at 555; IHO at 37-38). That evaluation related specifically to B's sensory issues, and no direct service was provided as a result. Moreover, the OT evaluations provided by Mrs. H requested services beyond handwriting and sensory skills – such as hygiene, toileting, and other functional living skills, and there is no evidence that these needs were ever considered by the District.

The IHO found that the District committed additional procedural violations by failing to provide prior written notice for failing to consider outside evaluations. (IHO at 19-20). The prior written notice is required any time a school district proposes or refuses to take action with respect to the provision of a child's FAPE. 34 C.F.R. § 200.503; O.A.C. § 3301-51-05(H). The Court finds that if the District elected not to consider the evaluations, it was required to comply with 34 C.F.R. § 300.503, which would have explained the District's action and notified Mrs. H of her rights. *Id. See e.g., Comty. Consol. School Dist. #93 v. John F.*, Case No. 00-cv-1347 (N.D. Ill. 2000). Without these notices, Plaintiff argues that she was not in a position to know her rights or the reasons for the District's denial. (Doc. 21 at 22-23).

The SLRO determined that the IEPs served as written notices when Mrs. H signed them in agreement with the services to be provided. (SLRO Opinion at 5).[26] Defendant

---

[26] Defendant also notes that Mrs. H was aided throughout the IEP process by experienced advocates. However, there is no evidence in the record to establish any legal advocacy by the education/disability advocates, nor does it excuse the school from complying with the federal requirements.

argues that because Mrs. H signed the IEP's she must have agreed with them. Plaintiff argues that Mrs. H signed her child's IEP because of the trust she placed in the District. (Tr. 750, 822-3, 825-6, 898). The Court finds that there is significant evidence that Mrs. H did not agree with the IEP's, which is why she had independent evaluations performed and sent to the school so that they would make changes to B's services. While the IEP can serve as written notice if the parent agrees, the record evidences that Mrs. H did not agree.

In *Deal v. Hamilton Cty. Bd. of Edu.*, 392 F.3d 840 (6th Cir. 2004), the Court held that merely because the parents were present and spoke at the IEP meeting, did not mean that they were "afforded adequate opportunity to participate." *Id.* at 862. "Where there was no way anything the Deals said, or any data the Deals produced could have changed the School System's determination of appropriate services, their participation was no more than after the fact involvement" *Id.* at 858. Mrs. H had private evaluations conducted by Children's Hospital, she sent letters, she had her psychologist send letters, and she had more evaluations completed in 2008. (Tr. 745, 748, 756, 773, 786).[27] Where the District has predetermined a program for a child, and no alternatives are considered at the IEP meeting, then the District has failed to allow parental participation in the meeting, as required. *Id.*

---

[27] Defendant argues that related services are only required when necessary to enable a child to benefit from special education and not when the parent or other member of the IEP team believes a related service will be simply beneficial to a child. 71 F.R. 46663, 46569 (2006). However, the Court finds that these private evaluations establish that the requested services were in fact required.

### 3.    *Substantive Harm*

In order for the procedural violations to amount to a denial of FAPE, they must have substantively harmed the child. *Knable*, 238 F.3d 755. Therefore, a procedural violation committed during the formulation of a child's IEP is actual only if that violation: (1) impedes that child's right to FAPE; (2) significantly impedes the parents' opportunity to participate in the decision making process; or (3) causes a substantive deprivation of benefits. 20 U.S.C. § 1415(E)(ii); 34 C.F.R. § 300.513(A)(2).

The SLRO found that there was nothing that supported the finding that B's educational benefits were "compromised or denied." (SLRO Opinion at 23 citing IHO Opinion at 18 - which does not say what the SLRO Opinion alleges). The Court disagrees and finds by a preponderance of the evidence that B suffered substantive harm. Both Dr. Jensen and the staff at Applied Behavioral Services found, separately and independently, that B needs direct speech and occupational therapy services, and requires services to assist with significant adaptive skill deficits. (Pet. Exs. B and BBBB). An October 2007 Occupational Therapy Evaluation done at Cincinnati Children's Hospital states "[t]he extent of B's problems currently interferes with the attainment of independence in occupational performance. Without skilled intervention, B may be at risk for further decline in occupational performance skills." (Pet Ex. QQ1; Tr. 376). The evidence presented at the hearing was that at age 10, B still had toileting accidents and hygiene issues, could not tie her shoes, and could not engage in reciprocal communication with

-24-

others. (Tr. at 146, 753-4; Pet. Ex. B at AAAA). All of B's evaluations were consistent in suggesting that B needed direct speech therapy and occupational therapy. (Pet. Ex. B, D, F, NN, OO, QQ, RR, SS, AAAA).

The Court finds that the IHO properly found that the failure to provide B with the necessary related services of speech and occupational therapy from May 2007-May 2009 constituted a denial of FAPE, as well as denial of meaningful participation to Mrs. H. (IHO Opinion at 22). Furthermore, the SLRO opinion is without any evidentiary or legal support and contains virtually no references to the record. Therefore, the Court finds by a preponderance of the evidence, that the District's failure to provide B with speech and occupational therapy constituted a denial of FAPE.

**B.    Behavioral Interventions**

Plaintiff alleges that B was also denied FAPE when the District did not consider the use of positive behavioral interventions and when it failed to address B's escalating behaviors, except through the use of restraint and punishment.

*1.    Standard*

The IDEA requires that students with disabilities must derive "meaningful educational benefit" from their special education programs. *Deal*, 392 F.3d at 862. The Sixth Circuit has mandated that this benefit be "gauged in relation to the potential of the child at issue." *Id.* "Only by considering an individual child's capabilities and potentialities may a court determine whether an educational benefit provided to that child

allows for meaningful advancement. In conducting this inquiry courts should heed the

congressional admonishment not to set unduly low expectations for disabled children."

*Id*. at 864.

IDEA requires that school districts "consider the use of positive behavioral

interventions and supports, and other strategies to address [that] behavior for a child

whose behavior impedes the child's learning or that of others." 34 C.F.R. §

300.324(a)(2)(i); O.A.C. § 3301-51-07(L)(1)(b)(i). Additionally, the IEP must contain

levels of both academic and functional performance, 34 C.F.R. § 320(a)(1), and must

contain annual goals with both academic and functional components. *Id*. at 34 C.F.R.

§ 320(a)(2).[28] IDEA covers students in thirteen categories of disability including students

with hearing, vision, and orthopedic impairments. 34 C.F.R. § 300.8. Those disabilities

are not "educational" but require specifically designed instruction where they adversely

affect the child's educational performance. 34 C.F.R. §§ 300.8 and 300.9.

### 2. *Behavioral interventions and the points system*

The IEP's behavior goals going back to 2006-07 were premised on the number of

points B earned in the "level" system. (IHO at 29). In November 2006, B's IEP stated

---

[28] In the comments to the federal regulations which were issued in 2006, the commentators noted that suggestions had been made that the word "functional" be defined specifically in the regulations. 71 Fed. Reg. No. 156 at 46661 (2006). The Department of Education declined to define the word "functional" in the regulations themselves because "we believe it is a term that is generally understood to refer to skills or activities that are not considered academic or related to a child's academic achievement. Instead, functional is often used in the context of routine activities of daily living." *Id*.

that her present levels for the behavior goal showed that she was achieving 100% of her "point" totals. (Pet. Ex. L1; IHO at 36). By November 2007, when her new IEP was being written, her goal had been downgraded requiring her only to achieve 75 out of 100 possible points. (Pet Ex. K7; IHO at 36). By the following year, in November 2008, B was only expected to achieve 65 of 100 points. (Ex. J3; Tr. 123-5, 515). The District acknowledged that she did not make progress on this IEP goal. (IHO at 36; Tr. 341). Accordingly, the IEP's show behavioral regression through the downgrading of B's goals each year. (IHO Opinion at 36; Pet. Exs. J, K and L; Tr. 384).

The special education and related services in an IEP developed under the IDEA must be "based on peer-reviewed research to the extent practicable." O.A.C. § 3301-51-07(H)(10(e). There is no evidence in the record that there was any scientific basis for the point system. Moreover, the IHO found and the evidence supports a finding that the point system was incomprehensible to B and was inconsistently applied. (IHO Opinion at 33-34; Tr. 66-68, 74-76, 85-6, 93-4, 497-9, 891; Pet. Ex. GG). Both Mrs. H and Rachel Perlstein, the MRDD consultant working with B, testified that the District was told that B, who has a cognitive deficit, did not understand the point system. (Tr. 514, 783-4, 920-21; Pet. Ex. W 13). The IHO found that where Mr. Nacke, the intervention specialist for the 2007-2009 school years, had to explain the points system to B 4-5 times per week, it should have become apparent to him that B was not able to understand it. (IHO Opinion at 34). Moreover, Dr. Jensen, Mr. Nacke, Rachel Perlstein, and Mrs. Hook all testified

about the inconsistent implementation of the points system. (Tr. 51-52, 67-69, 72-80, 86, 465-72, 783-84, 861-62, 885-86, 920-21).[29]  The Court finds that the IHO was in the best position to evaluate the credibility of these witnesses and will not "second guess" the credibility determinations made by an IHO who "was in the best position at the due process hearing to assess the credibility of the witnesses who testified." *Bd. of Educ. of the City School Dist. of the City of Cincinnati v. Wilhelmy*, 689 F.Supp.2d 970, 987 (S.D. Ohio 2009).

Additionally, the IHO found that Mr. Nacke was unduly punitive with B, and was punishing her for behavior related to her disability. (IHO Opinion at 35-36; Tr. 60-61, 118-119).  The IHO found it "striking" that the restraint was not necessary, especially after B was sent to another program, The Wildey School, where the same behaviors occurred but no physical restraint was necessary. (IHO Opinion at 30, 33-34, 36).  In fact, a progress report from B's school states that B has been able to manage her behavior, has had a reduction in the instances of behavioral outbursts, and while selectively mute at Holly Hill, now verbalizes responses. (Doc. 16, Ex. 1 at 2, 4-6).

The SLRO determined that because B "did not regress academically" or "suffer educationally" the District met the standard necessary to the provision of FAPE. (SLRO Opinion at 3, 34-36).  To support her position, the SLRO cited a number of cases for the

---

[29]  The SLRO found that there was "substantial" evidence contradicting the IHO's finding regarding the point system. (SLRO Opinion at 33).  However, the Court does not find any such "substantial" evidence in the record.

proposition that adverse impact on *academic performance* is the deciding factor in

determining whether FAPE has been denied to a student with behavioral issues. (SLRO

Opinion at 28). This fact alone supports a finding that the SLRO failed to apply the

proper standard and recognize that schools are required to look to both academic and

functional advances.[30] Moreover, in reviewing the cases cited, the Court finds that none

of the cases support the SLRO's position.[31] Additionally, the SLRO determined that the

use of physical restraints in managing the behavior of a student must be shown to actually

impact the educational opportunities available pursuant to the student's IEP. (SLRO

Opinion at 28).[32] The SLRO noted that correcting behavioral problems are not

educational goals where the behavior problems are the disability itself. (*Id.* at 28-29).

Again, the SLRO's findings indicate a misapplication of the proper standard. The IDEA

requires that the District address the student's behavior if it impedes their learning or that

---

[30] IDEA also mandates that FAPE be provided "to any individual child with a disability who needs special education and related services, even though the child has not failed or been retained in a course or grade, and is advancing from grade to grade." 24 C.F.R. § 300.101(c).

[31] *See, e.g., Covington v. Knox Cnty. Sch. Dist*, 205 F.3d 912 (6th Cir. 200) (Section 1983 action regarding the exhaustion of remedies where plaintiff never alleges violations of or even any mention of the IDEA); *Doe v. Westerville City Sch. Dist*, No. 2:07cv683, 2008 U.S. Dist. LEXIS 43784 (S.D. Ohio June 2, 2008) (addressing a student with a reading disability, where the student did not have any behavioral issues, or at least none that were discusssed in the case).

[32] The SLRO mischaracterized Plaintiff's argument by suggesting that Plaintiff's position as to denial of FAPE was based solely on the use of physical restraint. (SLRO Opinion at 27-33). It is clear from the pleadings that Plaintiff argues that where the District failed to implement positive behavioral supports as recommended by all of B's evaluators causing behavioral regression, B was denied FAPE. Additionally, Plaintiff alleges that Defendant's use of physical restraint was improper where there is no evidence that it was necessary or effective. (Doc. 21 at 27-31).

of others. The IDEA covers students with disabilities that are not per se educational, but require specially designed instruction. 34 C.F.R. §§ 300.8 and 300.39. The SLRO fails to acknowledge the functional component of B's IEP and Defendant's failure to apply appropriate positive behavioral interventions to address B's behavior/disability.

Moreover, the SLRO admitted that B had "escalating behaviors" and that the District's behavior "plans and interventions" were unsuccessful (SLRO Opinion at 36), and Defendant concluded that B's behavior was an essential part of her program since it included behavior goals in each of the IEPs at issue. (Pet. Exs. J3, K7, L1). Once these goals were included in B's IEP, the District was required to provide specially designed instruction "to address the unique needs of the child that result from the child's disability." 34 C.F.R. § 300.39 (b)(3)(i). The Court finds that Defendant failed to meet B's behavioral needs where it neglected to implement appropriate positive behavioral interventions, set increasingly low behavioral expectations, and employed physical restraint, even where shown to be ineffective.

Accordingly, the Court finds that the IHO properly found that B's behavior regressed from 2007-2009, while she was at Holy Hill, and that the District's failure to properly address her behavior constituted a denial of FAPE, especially where B's behavior goals themselves graphically demonstrated this regression. (IHO at 35-36).

### C.    The IHO's Award

The IHO found that there was a denial of FAPE because of the District's failure to

provide appropriate speech and occupational therapy, and since B was provided with

virtually none of those services in 2007-2008 or 2008-2009, the IHO awarded her two

years of speech and occupational therapy services to compensate her for what she should

have recieved. (IHO Opinion at 41). The IHO also found that there was a denial of

FAPE because of the District's failure to provide appropriate behavior management

services during the 2007-2008 and 2008-2009 school years, and, therefore, the IHO

awarded B two years of compensatory education at ABS for the 2009-2010 and 2010-

2011 school years. (IHO Opinion at 43).

Conversely, the SLRO concluded that since B received FAPE, she was not entitled

to any compensatory education. Despite having found that B was not entitled to any

compensatory education, the SLRO proceeded to find fault in the IHO award because it

constituted an "hour for hour" award which the SLRO determined was contrary to the

method by which such awards are determined. (SLRO Opinion at 37-38). Defendant

maintains that since the IHO's awards were arbitrary, the SLRO was correct in overruling

them.

Plaintiff argues, however, that the SLRO had no jurisdiction to rule on the

compensatory education award for 2009-2010, since this issue was not raised in the

appeal. (*Id.*) In its brief to the SLRO, the District expressly stated that "B's placement at

ABS for the 2009-10 school year is not at issue in this appeal." (Resp.'s SLRO Brief at

2). The SLRO stated in a footnote at the beginning of its decision that "[t]he remaining

portions of the IHO Decision that ordered the District to provide B with appropriate

transportation and to pay for the cost of a Functional Behavioral Analysis to be conducted

by ABS were not raised as appeal issues by the appellant School District in their Notice

of Appeal." (SLRO Opinion at 1). Although not stated expressly, the SLRO's statement

indicates that if the District failed to raise the issue in their Notice of Appeal, then it was

not properly before the SLRO. This Court finds that there is no mention of the

compensatory education award for 2009-2010 in the Notice of Appeal.[33]

### 1.    *ABS Placement*

An award of compensatory education is an equitable remedy granted by the court

as it finds appropriate. *Bd. of Educ. of Fayette Cty. Ky v. L.M.*, 478 F.3d 307 (6th Cir.

2007). Courts have broad discretion under the IDEA to fashion appropriate relief to

remedy a denial of FAPE. *Sch. Comm. of Burlington v. Mass. Dep't of Educ.*, 471 U.S.

359, 369 (1985).[34] "Under the theory of compensatory education, courts . . . may award

education services . . . to be provided prospectively to compensate for a past deficient

---

[33] Neither party provided any case law to support their position on whether this issue was properly before the SLRO, and the Court was unable to glean guidance from reviewing the relevant statutory language.

[34] *See also Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th Cir. 2006) ("The courts have discretion on how to craft the relief and there is no obligation to provide a day-for-day compensation for time missed.").

-32-

program." *Reid v. District of Columbia*, 401 F.3d 516, 522 (D.C. Cir. 2005).

Compensatory education is meant to "place children in the position they would have been in but for the violation of the Act." *Draper v. Atlanta Indep. School Sys.*, 480 F.Supp.2d 1331 (N.D. Ga. 2007), *aff'd* 518 F.3d 1275 (11th Cir. 2008).

The SLRO faulted the IHO because she believed he used an "hour for hour" analysis in ordering two years compensatory education for B, because B lost two years of FAPE at Holly Hill. (SLRO Opinion at 38-40). While the courts have moved away from "hour for hour" awards because it removes the hearing officer's discretion, there is no support for the proposition that it is never appropriate.[35] Dr. Jensen's expert report recommended three to four years of remedial behavioral and adaptive behavior instruction, and Plaintiff requested three years placement. (Pet.'s IHO Brief at 39). Where the IHO ordered only two years of placement at ABS, the Court finds that such compensation should be restored. As this Court stated earlier, the IHO was in the best position to evaluate the case, and this Court will not second guess its determination.

---

[35] *See, e.g., Reid ex rel. Ried v. Dist. of Columbia*, 365 U.S. App. D.C. 234, 401 F.3d 516, 524 (D.C. Cir. 2005) (rejecting an hour-for-hour compensatory-education award in favor of a more flexible approach because some students may need only "short, intensive compensatory programs" while others may need extended programs that would exceed "hour-for-hour replacement of time spent without FAPE"). However, an appropriate award of compensatory education is "relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994).

### 2.    *Least Restrictive Environment*

Additionally, the District argues that ABS is not the least restrictive environment[36] for B and therefore not an appropriate placement. (Resp.'s SLRO Brief at 39-40). At the hearing, evidence was given that ABS was the appropriate placement for B. (Tr. 189, 198, 731, 813 and Ex. AAAA4). While ABS is more restrictive than the public school, Dr. Jensen's report establishes the need for a structured program offering applied behavior analysis. (Pet. Ex. B). There is no evidence that Defendant can offer this type of learning environment.[37] As discussed above, Defendant's IEPs failed to provide the services that B required. Based on the administrative record and giving due deference to the determinations of the IHO and SLRO, the Court finds that the preponderance of the evidence in this case supports a finding that ABS is the least restrictive environment for B. Moreover, the record shows that Plaintiff is progressing at ABS, and this Court sees no reason to disrupt a successful placement. (Doc. 16, Ex. 1).

---

[36] "[T]he least restrictive environment is a mandate favoring mainstreaming, that is, the education of disabled children alongside non-disabled children to the maximum extent appropriate for the individual child." *McLaughlin v. Holt Public Schools Bd. of Educ.*, 320 F.3d 663, 671-72 (6th Cir. 2003). The IDEA provides that removal from the general education classroom "occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5).

[37] *See, e.g., Wilhelm*y, 689 F.Supp.2d at 990 ("The Sixth Circuit has recognized that mainstreaming does not always provide the educational benefit intended by the IDEA because some handicapped children simply must be educated in segregated facilities either because the handicapped child would not benefit from mainstreaming [or] because any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting.").

### 3.   *Speech and Occupational Therapy*

The IHO awarded B two years of remedial speech and occupational therapies. (IHO Opinion at 43).   Subsequently, the SLRO found that the IHO improperly delegated his authority to the IEP team in the calculation of the speech and occupational services, because while two years's worth of services was awarded, the specific number of days was left to the IEP team.[38]   (SLRO Opinion at 39-41).   The Court finds that the evidence supports the IHO's order requiring two years of remedial therapies.   (Pet Exs. D, OO, QQ, RR, SS, and AAAA).   Plaintiff requested that these therapies be provided 1-2 days per week as indicated in the evaluations (Pet.'s IHO Brief at 29), and the Court finds that the request is supported by the record evidence.

### D.   Attorneys' Fees

Finally, Plaintiff alleges that the SLRO improperly denied her prevailing party status and an entitlement to receive attorney fees.   The IDEA permits parents who prevail on their claims to receive their attorneys' fees.   20 U.S.C. §1415(i)(3)(B).   A parent is a prevailing party when they "succeed on any significant issue in litigation which achieves

---

[38]   The SLRO cited *Bd. of Educ. of Fayette Cnty v. L.M.*, 478 F.3d 307, 317 (6th Cir. 2007) in support of this argument.   However, the *Fayette* decision is inapposite here.   The IHO never permitted for the IEP team to reduce or eliminate the amount of the award in this case, and therefore there is no improper delegation.   With respect to the two years of private educational placement at ABS, the SLRO concluded that the IHO erred in making such an award because there was no evidentiary testimonial support to identify specific losses of educational benefits and therefore the mechanical calculation of a two year educational award was arbitrary and contrary to law. (SLRO Decision at 39-40).   In fact, the hearing officer in *Fayette* specifically permitted the IEP team to reduce or even eliminate the amount of compensatory services awarded if it chose to do so.

some of the benefit the parties sought in bringing suit." *Keene v. Zelman*, 337 F. Appx. 553, 556 (6th Cir. 2009). Plaintiff claims that because her award of compensatory education was not appealed by the District, she has succeeded on that portion of her claim. (See argument supra at ___, reporting the District's failure to contest B's 2009-2010 placement at ABS).

The District, however, alleges that it had already made the placement sought before the hearing, and that because the parties agreed to change the "stay put" placement, the IHO opinion was unnecessary.[39] (Doc. 23 at 10). If the parties had in fact settled the case prior to the hearing, Plaintiff would not be entitled to fees. *Buckhannon Bd. & Care Home Inc. v. West Virg. Dep't of Health & Human Res.*, 532 U.S. 598 (2001). The evidence reveals an exchange of letters between counsel where the District made a settlement offer that the Plaintiff rejected. (Resp.'s Exs. 38, 39). Moreover, the SLRO's reversal of the IHO decision on the compensatory award for the 2009-10 school year cannot stand where the SLRO had no jurisdiction to address an issue not properly before her. (Doc. 21 at 43). Where the District failed to appeal an issue, the SLRO could not affirm or reverse either way. (*Id.*)

---

[39] The IDEA states that during the pendency of a due process proceeding, the child at issue remains in the current educational placement "unless the State or local agency and the parents of the child agree otherwise." 34 C.F.R. § 300.518(a). An agreement to change the "stay put" placement has nothing to do with the need for a hearing officer's deicison. An agreement as to "stay put" does not alter the progression of a due process hearing. (*Id.*)

## V.    CONCLUSION

Based on the evidence of record, the Court finds that Plaintiff proved her case by

the preponderance of the evidence, and has established that B was denied a FAPE.

Accordingly, Defendant's motion for summary judgment (Doc. 20) is **DENIED** and

Plaintiff's motion for summary judgment (Doc. 21) is **GRANTED** as follows:

(1)    The West Clermont Local School District shall pay for the placement of B
for the 2009-2010 and the 2010-2011 school years at Applied Behavioral
Services ("ABS");

(2)    The District shall pay for direct speech therapy and direct occupational
therapy in the ABS program for two years 1-2 times per week as determined
by B's IEP team, which will include Mrs. H, the occupational therapist, and
the speech therapist.

(3)    Plaintiff is the prevailing party and is therefore entitled to an award of her
attorney fees and costs.  Within **21 DAYS** of entry of this Order, Plaintiff
shall evidence by affidavit and exhibits her fees and costs incurred in
pursuing this matter.

**IT IS SO ORDERED.**

Date:    4/26/11

Timothy S. Black
United States District Judge

-37-